UNITED STATES of America, ex rel. James R. RICHARDS, Inspector General, U.S. Department of the Interior, Petitioner–Appellee,

v.

Lorenzo De LEON GUERRERO, Governor and Custodian of Records for the Department of Finance, Commonwealth of the Northern Mariana Islands, Respondent.

Herman S. Sablan, et al., Applicants–Appellants.

UNITED STATES of America, ex rel. James R. RICHARDS, Inspector General, U.S. Department of the Interior, Plaintiff–Appellee,

v.

Lorenzo De LEON GUERRERO, Governor and Custodian of Records for the Department of Finance, Commonwealth of the Northern Mariana Islands, Defendant–Appellant.

Nos. 92–15884, 92–16372.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 14, 1993.

Decided Sept. 1, 1993.

Howard P. Willens, Wilmer, Cutler & Pickering, Washington, DC, for respondent-defendant-appellant De Leon Guerrero.

Michael W. Dotts, Law Office of Robert J. O'Connor, Saipan, MP, for applicants-appellants Sablan and Salas.

Douglas Letter and Joan E. Hartman, U.S. Dept. of Justice, Washington, DC, for petitioner-plaintiff-appellee.

Before: ALDISERT,* GOODWIN, and FLETCHER, Circuit Judges.

GOODWIN, Circuit Judge:

Lorenzo de Leon Guerrero, Governor and Custodian of Records for the Department of Finance of the Commonwealth of the Northern Mariana Islands ("CNMI" or "Commonwealth"), appeals the district court's enforcement of an administrative subpoena mandating the release to the Inspector General of the United States Interior Department of tax

---

* Ruggero J. Aldisert, Senior Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

records necessary to conduct an audit of the CNMI pursuant to the Insular Areas Act, 48 U.S.C. § 1681b. The Governor challenges the district court's determination that enforcement of the subpoena does not offend the Commonwealth's right of local self-government as defined under Sections 103 and 105 of the Covenant. In addition, taxpayers Herman S. Sablan and Antonio T. Salas appeal the district court's denial of their motion to intervene in the proceedings. We affirm.

## I. *Background*

Rota, Tinian and Saipan, the most populated islands of the Northern Marianas, lie directly north of Guam. For over three hundred years, the Northern Marianas and Guam were Spanish colonies sharing common languages, religion, and culture. The political ties between the Northern Marianas and Guam were eventually broken by the Spanish–American War of 1898, with Guam becoming a territory of the United States and the Northern Marianas coming under German, and then Japanese, rule.

After World War II, the United Nations established the Trust Territory of the Pacific Islands encompassing most of the islands of Micronesia, among them the Northern Mariana Islands, to be administered by the United States pursuant to a Trusteeship Agreement with the United Nations Security Council. *See* Trusteeship Agreement for the Former Japanese Mandated Islands, 61 Stat. 3301, T.I.A.S. No. 1665, art. 3. The Trusteeship Agreement imposed on the United States an obligation to "promote the development of the inhabitants of the trust territory toward self-government or independence." *Id.* art. 6, § 1.

In October 1969, the United States entered into negotiations with the Congress of Micronesia to determine Micronesia's future political status. Efforts to establish a unified Micronesian state, however, were undermined by a lack of consensus about the region's political future. Cultural, linguistic, and geographic differences ·among the populations of the Micronesian island groups led to several proposed solutions to the end of the Trusteeship. The Congress of Micronesia, for instance, was in favor of establishing a freely associated state, independent of the United States. The Northern Mariana Islands, on the other hand, sought a close and permanent association with the United States. Proximity and a shared history with Guam gave the people of the Northern Mariana Islands some familiarity with the United States, making it the least alien major power with whom negotiations might be initiated. Representatives of the Northern Marianas thus pursued separate political status talks with the United States over a period of years.

In 1972, the United States entered into formal negotiations with the Northern Marianas. Meanwhile, the residents of the eastern Caroline Islands, Pohnpei, and Kosrae, together with Chuuk and Yap in the west, began to form the Federated States of Micronesia. The Federated States and the Marshall Islands became independent, sovereign nations in 1985. Palau went its own way, and is now more or less an independent republic with some residual trust relations with the United States.

Negotiations between the United States and the Northern Marianas culminated on February 15, 1975 with the signing of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America ("Covenant"). The Covenant was unanimously endorsed by the NMI legislature, approved by 78.8% of NMI plebiscite voters, and enacted into law by Congress. Joint Resolution of March 24, 1976, Pub.L. No. 94–241, 90 Stat. 263, *reprinted in* 48 U.S.C. § 1681 note. The Covenant was implemented in three phases between March 24, 1976 and November 3, 1986. Covenant § 1003. On November 3, 1986, with the Covenant in full effect, the United States terminated the Trusteeship Agreement with respect to the CNMI by Presidential Proclamation. Proclamation No. 5564, 51 Fed.Reg. 40,399 (1986), *reprinted in* 48 U.S.C. § 1681 note, at 222.[1]

---

1. The United Nations Security Council formally dissolved the Trusteeship in 1990. S.C.Res. 683, U.N. SCOR, 45th Sess., U.N. Doc. S/RES/683 (1990).

The Covenant is comprised of ten articles governing the political relationship between the Northern Marianas and the United States. This case continues an ongoing debate about whether the Commonwealth's right of local self-government as defined in the Covenant under Section 103 substantially limits Congress' legislative powers over the Commonwealth under Section 105. This question has been implicated in one way or another in a number of our cases. *See, e.g., Hillblom v. United States,* 896 F.2d 426 (9th Cir.1990); *A & E Pac. Constr. Co. v. Saipan Stevedore Co.,* 888 F.2d 68 (9th Cir.1989). Indeed, the legal question we now face was previously before the district court when the CNMI government resisted an audit by the Inspector General in 1989. The Inspector General issued a subpoena which was summarily enforced by the district court. The appeal, however, was eventually dismissed as moot when the CNMI complied with the district court order. *See United States ex rel. Richards v. Sablan,* Misc. No. 89–008, 1989 WL 158917, 1989 U.S.Dist. LEXIS 16786 (D.N.M.I. Oct. 27, 1989), *appeal dismissed as moot,* No. 89–16404 (9th Cir.1991).

Not surprisingly, the issue was revived when the Assistant Inspector General informed the Governor on May 29, 1991 that the Office of Inspector General intended to conduct an audit of the CNMI's Department of Finance. The CNMI government refused to grant the Inspector General access to the records necessary to conduct the audit, expressing concern that the intended audit would violate the CNMI's right of self-government and the privacy rights of CNMI taxpayers.

Meanwhile, two taxpayers, Herman S. Sablan and Antonio T. Salas, went to the CNMI courts seeking an injunction to prevent the CNMI from disclosing confidential taxpayer information to the Inspector General. On August 20, 1991, the CNMI Supreme Court issued a temporary injunction prohibiting the release of tax information to "any person not authorized by CNMI statute." *Sablan v. Inos,* No. 91–003, slip. op. at 3–4 (N.M.I. filed Aug. 20, 1991).

On December 11, 1991, the Inspector General served a subpoena duces tecum on the Governor, ordering him to produce all information pertaining to (1) the administration and operation of the CNMI income tax system, (2) Department of Finance personnel, and (3) enforcement of the CNMI income tax laws during 1989–91, including, but not limited to, all accounting records, reports, and tax returns. Then, on December 26, 1991, the CNMI Supreme Court issued its opinion in *Sablan v. Inos,* holding that the audit would impermissibly intrude on the taxpayers' privacy rights under the CNMI Constitution and under the CNMI tax confidentiality provision, 4 CMC § 1701(d)(1). *Sablan v. Inos,* No. 91–018, slip op. at 4–5, 1991 WL 328470 (N.M.I. filed Dec. 26, 1991). The court also held that the Insular Areas Act, 48 U.S.C. § 1681b, authorizing the Inspector General to audit the accounts of the Commonwealth was inconsistent with the self-governance provisions of the Covenant, and therefore that the statute "has no force and effect in the CNMI." *Id.* at 8.

Citing the decision in *Sablan v. Inos,* the Governor refused to comply with the subpoena, and the Inspector General petitioned for its enforcement in the district court. The district court enforced the administrative subpoena, finding that the Inspector General had statutory authority to exercise subpoena powers, and that exercise of such authority did not offend the right of self-government provisions of the Covenant.

The Governor challenges the decision of the district court on the following grounds: (1) that the enforcement of the subpoena violates the CNMI's right to local self-government, in contravention of both the plain meaning and the negotiating history of Sections 103 and 105 of the Covenant; (2) that the Inspector General lacks the statutory authority to exercise subpoena power under the Insular Areas Act; (3) that the confidentiality provisions of 26 U.S.C. § 6103 prohibit the disclosure of confidential tax return information to the Inspector General; and (4) that the district court erroneously invalidated Section 502 of the Covenant.

Consolidated with the Governor's case is the appeal of taxpayers Herman S. Sablan and Antonio T. Salas challenging the district court's denial of their motion to intervene in

the enforcement proceedings. Although the district court denied intervention, it did allow Sablan and Salas to present briefs and to argue before the court as *amicus curiae* to the Governor. Sablan and Salas nonetheless contend that they had a right to intervene under Federal Rule of Civil Procedure 24(a) because the Governor could not fully represent their interests.

## II. *Statutory Authority for Subpoena Power*

"The authority of an administrative agency to issue subpoenas for investigatory purposes is created solely by statute." *Peters v. United States*, 853 F.2d 692, 696 (9th Cir.1988). Accordingly, the threshold issue we must address is whether Congress has authorized the Inspector General to exercise subpoena powers in furtherance of his audit function under the Insular Areas Act, 48 U.S.C. § 1681b.

The Insular Areas Act unambiguously provides the authority for the Inspector General to conduct an audit of the CNMI.[2] But, the statute is silent with regard to the question of subpoena power. We do not, however, accept the Governor's contention that this silence is dispositive.

■ The audit power granted by the Insular Areas Act was "*in addition* to the authority conferred upon the Inspector General by the Inspector General Act of 1978." 48 U.S.C. 1681b(b) (emphasis added). The Inspector General Act of 1978 specifies that the Inspector General has the authority to require by subpoena all the information necessary to carry out his duties. 5 U.S.C. app. 3 § 6(a)(4). This discretion to exercise subpoena authority extends to the audit functions assigned to the Inspector General under the Insular Areas Act. *Cf. Territorial Court of the Virgin Islands v. Richards*, 847 F.2d 108 (3d Cir.1988) (enforcing Inspector General's subpoena in support of audit of Virgin Islands court). The district court was there-

fore correct in holding that the Inspector General has the full range of authority provided by the Inspector General Act of 1978 at his disposal in implementing the Insular Areas Act.

## III. *Right of Local Self–Government*

We now turn to the central question in this case: whether the Insular Areas Act conflicts with the self-governance provisions of the Covenant. The relevant sections of the Covenant provide as follows:

*Section 101*

The Northern Mariana Islands upon termination of the Trusteeship Agreement will become a self-governing commonwealth to be known as the "Commonwealth of the Northern Mariana Islands," in political union with and under the sovereignty of the United States of America.

*Section 102*

The relations between the Northern Mariana Islands and the United States will be governed by this Covenant which, together with those provisions of the Constitution, treaties and laws of the United States applicable to the Northern Mariana Islands, will be the supreme law of the Northern Mariana Islands.

*Section 103*

The people of the Northern Mariana Islands will have the right of local self-government and will govern themselves with respect to internal affairs in accordance with a Constitution of their own adoption.

*Section 105*

The United States may enact legislation in accordance with its constitutional process which will be applicable to the Northern Mariana Islands, but if such legislation cannot also be made applicable to the several States the Northern Mariana Islands must be specifically named therein for it to become effective in the Northern Mariana Islands. In order to respect the right of self-government guaranteed by this Cove-

---

**2.** Initially, it was the government comptroller for Guam who was responsible for exercising supervisory audit authority over the Trust Territory. *See* 48 U.S.C. § 1681b (Supp. III 1973). Then, to ensure "a satisfactory level of independent audit oversight of the governments of the Mar-

shall Islands, the Federated States of Micronesia, Palau, and the Northern Mariana Islands," Congress transferred the audit authority to the Inspector General of the Department of Interior in 1982. 48 U.S.C. § 1681b(a).

nant the United States agrees to limit the exercise of that authority so that the fundamental provisions of this Covenant, namely Articles I, II and III and Sections 501 and 805, may be modified only with the consent of the Government of the United States and the Government of the Northern Mariana Islands.

The Governor contends that a federal audit of Commonwealth finances intrudes upon the Commonwealth's right of local self-government reserved under Section 103 of the Covenant. He argues further that because of this alleged conflict between the Insular Areas Act and Section 103, the enactment of § 1681b exceeds the scope of congressional lawmaking authority permitted by Section 105 of the Covenant. We disagree.

■ At the outset, we emphasize that "the authority of the United States towards the CNMI arises solely under the Covenant." *Hillblom v. United States*, 896 F.2d 426, 429 (9th Cir.1990). The Covenant has created a "unique" relationship between the United States and the CNMI, and its provisions alone define the boundaries of those relations. *Commonwealth of the Northern Mariana Islands v. Atalig*, 723 F.2d 682, 687 (9th Cir.1984). For this reason, we find unpersuasive the Inspector General's reliance on the Territorial Clause, U.S. Const. art. IV, § 3, cl. 2, as support for enforcement of the federal audit. He argues that because the CNMI is governed through Congress' power under the Territorial Clause, Congress has plenary legislative authority over the CNMI. *See Simms v. Simms*, 175 U.S. 162, 168, 20 S.Ct. 58, 60, 44 L.Ed. 115 (1899) (explaining that under the Territorial Clause, Congress "has the entire dominion and sovereignty, national and local, Federal and state, and has full legislative power over all subjects upon which the legislature of a state might legislate within the state"). The applicability of the Territorial Clause to the CNMI, however, is not dispositive of this dispute. Even if the Territorial Clause provides the constitutional basis for Congress' legislative authority in the Commonwealth, it is solely by the Covenant that we measure the limits of Congress' legislative power.

■ Congress' legislative authority over the Commonwealth derives from Section 105. The first sentence of Section 105 provides that the United States may legislate with respect to the CNMI, "but if such legislation cannot also be made applicable to the several States the Northern Mariana Islands must be specifically named therein for it to become effective in the Northern Mariana Islands." That Congress has the power to pass legislation with respect to the CNMI that it would not pass with respect to the states is plain. Having recognized that the potential scope of power over the CNMI would be greater than that over the states, Section 105 requires that Congress specifically identify the CNMI in cases where such legislation is not equally applicable to the states. As the Marianas Political Status Commission ("MPSC") explained in its contemporaneous analysis of the Covenant, this requirement is to ensure that Congress will exercise its legislative powers "purposefully, after taking into account the particular circumstances existing in the Northern Marianas." Marianas Political Status Commission, *Section-by-Section Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands* 15 (1975). The United States took a similar view: the "purpose of this provision is to prevent any inadvertent interference by Congress with the internal affairs of the Northern Mariana Islands to a greater extent than with those of the several States." Department of Interior, *Section-by-Section Analysis of the Covenant, reprinted in To Approve "The Covenant to Establish a Commonwealth of the Northern Mariana Islands," and for Other Purposes: Hearing Before the Subcomm. on Territorial and Insular Affairs of the House Comm. on Interior and Insular Affairs*, 94th Cong., 1st Sess. 385 (1975). In light of these concerns, we interpret the first sentence of Section 105 to mean that the United States must have an identifiable federal interest that will be served by the relevant legislation.

At the center of this dispute, however, is the second sentence of Section 105 limiting the United States' legislative authority "so that the fundamental provisions of this Covenant … may be modified only with the consent of the Government of the United

States and the Government of the Northern Mariana Islands." The Governor asks us to read this provision, in conjunction with the self-government provision of Section 103, as carving out an area of "local affairs" immune from federal legislation. We decline to adopt such an expansive interpretation of the Section 105's mutual consent provision. Particularly when viewed against the backdrop of Section 101 establishing the sovereignty of the United States and Section 102 making the Covenant and all federal laws applicable to the CNMI the supreme law of the CNMI, the Governor's position is untenable. The mutual consent provision states that Congress may not override or alter the fundamental provisions of the Covenant, among them the right of self-government guaranteed by Section 103. This does not mean that Congress may not pass any legislation "affecting" the internal affairs of the CNMI.

To give due consideration to the interests of the United States and the interests of the Commonwealth as reflected in Section 105, we think it appropriate to balance the federal interest to be served by the legislation at issue against the degree of intrusion into the internal affairs of the CNMI. Performing that balance here, we find that the Insular Areas Act satisfies Section 105.

There is no question that the United States has a substantial federal interest in monitoring the CNMI's collection of taxes. To date, the United States has provided the CNMI with over $420 million in direct assistance in accordance with Sections 701 and 702 of the Covenant. Moreover, to help the CNMI raise funds, the United States agreed not to collect any federal income tax on income earned by island residents in the Commonwealth. Instead, Section 601 enables the local government to collect what would otherwise be federal taxes as a local income tax. The United States therefore has a significant interest in ensuring that federal funds are being used properly and in determining the efficacy of the CNMI's revenue collection to assess future amounts of assistance.

The other consideration in our analysis is the degree of intrusion into the internal affairs of the CNMI. Although the Governor would like to characterize this case as one involving unwarranted federal interference with the CNMI's internal fiscal affairs, the fact is that the financial assistance provided by the United States inextricably links federal and CNMI interests. This financial support was deemed to be such an integral part of the relationship and so essential to the economic development of the CNMI that it was embodied in the Covenant itself rather than in separate legislation. *See* Articles VI, VII. In view of the fact that a substantial portion of the CNMI budget is comprised of direct and indirect federal financial assistance, we cannot say that a federal audit impermissibly intrudes on the internal affairs of the CNMI.

We therefore affirm the district court's enforcement of the administrative subpoena pursuant to the Insular Areas Act.

## IV. *Confidentiality Provisions*

The Governor also argues that enforcement of the administrative subpoena violates the confidentiality provisions of Section 6103 of the Internal Revenue Code, 26 U.S.C. § 6103. Section 6103 generally prohibits state officials from disclosing confidential tax return information except to those specifically authorized. This provision has been made applicable to the CNMI. *See* 26 U.S.C. § 6103(b)(5)(A). Because the Inspector General is not expressly enumerated in the list of exceptions to § 6103's prohibition against disclosure, the Governor argues that § 6103 prevents him from complying with the Inspector General's subpoena.

■ The district court properly held that the Insular Areas Act, 48 U.S.C. § 1681b, by authorizing an audit of the CNMI, implicitly amended the confidentiality provisions of 26 U.S.C. § 6103 to authorize disclosure of confidential tax information to the Inspector General. Under the Insular Areas Act, the Inspector General is required "to report to the Secretary of the Interior ... all failures to collect amounts due" the CNMI government. To comply with this duty, the Inspector General must have access to individual tax return information.

Although we do not construe § 6103 to bar disclosure of income tax return information

to the Inspector General, we expect him to comply with the district court's order to provide internal safeguards ensuring strict measures of confidentiality throughout the course of the audit.

## V. *Section 502*

The Governor also challenges dicta in the district court's opinion regarding Covenant Section 502, the mechanism through which a body of federal law was brought into effect upon the establishment of the Commonwealth government in January 1978.

The district court found that "Section 502 was an interim formula, valid until the assumption of full sovereignty by the United States when all United States laws applicable to the several States would be in effect of their own force, unless elsewhere excluded by the Covenant or by Congress." *Richards v. Guerrero*, No. 92–00001, slip op. at 55, 1992 WL 321010 (D.N.M.I. July 24, 1992). Therefore, concluded the district court, "Covenant § 502 is no longer in effect. All federal laws applicable to the several States apply to the CNMI, unless excluded by Congress." *Id.* at 56.

The Governor thus asserts that the district court erroneously invalidated Section 502. We need only clarify that Section 502 governs the application to the CNMI of federal laws existing prior to January 9, 1978, and that Section 105 governs the application of federal laws enacted after that date.

## VI. *Motion to Intervene*

Taxpayers Sablan and Salas ("Intervenors") assert that the district court erred by denying their motion to intervene in the enforcement proceedings pursuant to Fed. R.Civ.Proc. 24(a). The district court instead assigned them the status of *amicus curiae* and allowed them to file briefs and present oral argument. The district court's decision to deny the motion for intervention may be reversed only if there has been an abuse of discretion. *Garrett v. United States*, 511 F.2d 1037, 1038 (9th Cir.1975).

Intervenors assert voting and privacy interests that they maintain will remain unprotected if they are denied intervention. Brief-ly, they argue that enforcement of the subpoena violates the right of local self-government of the people of the CNMI, and concomitantly, dilutes their right to vote for the CNMI officials who govern internal affairs. In addition, they maintain that enforcement infringes their constitutionally protected privacy interests in individual tax return information as recognized by the CNMI Supreme Court in *Sablan v. Inos*, No. 91–018, 1991 WL 328470 (N.M.I. filed Dec. 26, 1991). We disagree.

The United States Supreme Court has held that there is no intervention as a matter of right for taxpayers in subpoena enforcement proceedings against a third party. *Donaldson v. United States*, 400 U.S. 517, 531, 91 S.Ct. 534, 542, 27 L.Ed.2d 580 (1971). Thus, intervention is permissive only. *See Garrett v. United States*, 511 F.2d at 1038. To succeed on their motion, Intervenors must demonstrate that they have a "significantly protectable interest" in the tax records. *Id.* The district court correctly concluded that Intervenors' "voting rights" argument is essentially the same as the right of self-government argument presented by the Governor. In addition, we agree that the privacy interests asserted by Intervenors were adequately represented by the position of the Governor and were insufficient to warrant intervention. *See United States v. Miller*, 425 U.S. 435, 444–46, 96 S.Ct. 1619, 1624–26, 48 L.Ed.2d 71 (1976) (bank depositor lacked sufficient 4th Amendment interest to challenge subpoenas issued to bank). The denial of the motion to intervene therefore does not constitute an abuse of discretion.

For the foregoing reasons, the judgment of the district court is *AFFIRMED*.