# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
       *Plaintiff-Appellee,*

v.

CHANG DA LIU,
       *Defendant-Appellant.*

No. 06-10758

D.C. No.
CR-05-00027-ARM

UNITED STATES OF AMERICA,
       *Plaintiff-Appellee,*

v.

MING YAN ZHENG, aka Li-Na,
       *Defendant-Appellant.*

No. 06-10760

D.C. No.
CR-05-00027-ARM

OPINION

Appeal from the United States District Court
for the District of the Northern Mariana Islands
Alex R. Munson, Chief District Judge, Presiding

Argued and Submitted
March 10, 2008—San Francisco, California

Filed August 13, 2008

Before: Procter Hug, Jr., Pamela Ann Rymer, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Hug

10513

**COUNSEL**

Steven P. Pixley, San Jose, Saipan, M.P., for appellant Chang Da Liu, and G. Anthony Long, San Jose, Saipan M.P., for appellant Ming Yan Zheng.

Michael A. Rotker, Attorney, U.S. Department of Justice, Washington, D.C., for the appellee.

**OPINION**

HUG, Circuit Judge:

A jury found Ming Yan Zheng and Chang Da Liu guilty of conspiracy, two counts of sex trafficking, foreign transportation for prostitution, and transportation of persons in execution of fraud.[1] The district court sentenced Zheng to 78 months imprisonment, fined her $55,000, and ordered her to pay $47,440 in restitution and a $500 assessment. The court sentenced Liu to 57 months, made him jointly and severally liable for $47,440 in restitution, and ordered him to pay a $500 assessment.

This is a consolidated direct appeal. Zheng challenges her convictions on the grounds that (1) the court lacked jurisdiction to prosecute her; (2) the evidence was insufficient to support her convictions; (3) the district court's evidentiary rulings created reversible error; (4) there was prosecutorial misconduct; and (4) the court failed to properly instruct the jury. Zheng also challenges her sentence on the grounds that (1) the sentencing guideline calculation was incorrect and (2) restitution was improper or was incorrectly calculated.

Liu challenges his convictions on the grounds that the court's evidentiary rulings created reversible error.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the district court on all challenged grounds.

### *Background*

Zheng is a Chinese citizen who moved to the Commonwealth of the Northern Mariana Islands (CNMI) where she met Liu. Together, Zheng and Liu opened a brothel in Saipan, the capital of the CNMI, called the Tea House. They recruited

---

[1]Violations of 18 U.S.C. §§ 371, 1591, 2421, and 2314 respectively.

employees in Dalian, China by placing advertisements for hotel waitresses, nightclub performers, and service workers with a Chinese recruiting company. The recruitment flyer stated the employees would earn about $3,000-$4,000 per month, and applicants were required to pay $6,000 in "processing fees" to secure a position.

Chinese women, including Xuimei Chi and Wei Lian, saw these advertisements and signed agreements to become "hotel waitresses." Chi and Lian each paid part of their $6,000 fee and arrived in Saipan in debt to Zheng. Upon arriving in Saipan, Chi, Lian, and four other young women from China were taken to housing barracks and then to the Tea House. At the Tea House, the women testified that they learned they were required to have sex with customers. The women protested but eventually submitted and worked as prostitutes in the Tea House from October 2004 to May 2005.

In June 2005, the six women went to the FBI and an investigation of Zheng, Liu, and the Tea House began, which resulted in Zheng and Liu's convictions.

## A. Jurisdiction and Federal Legislative Authority over the CNMI

Zheng contends her convictions are invalid because the federal government lacked authority to prosecute her. Whether the federal government had authority to prosecute Zheng is a legal question that we review de novo. *See United States v. Philips*, 367 F.3d 846, 854 (9th Cir. 2004) (jurisdictional issues are reviewed de novo); *United States v. Mateo-Mendez*, 215 F.3d 1039, 1042 (9th Cir. 2000) (questions of law are reviewed de novo). Zheng argues the criminal statutes used to convict her do not apply to the CNMI because they were enacted pursuant to Congress's authority under the commerce clause or the territorial clause and neither the commerce clause nor the territorial clause applies to the CNMI.

**[1]** To understand this argument, it is necessary to briefly discuss the history and relationship of the CNMI with the United States. The Northern Mariana Islands became a possession of the United States in 1944, during the war with Japan, when the United States invaded Saipan. In 1975, the Northern Mariana Islands and the United States reached an agreement to create a political union between the Islands and the United States. This agreement was the "Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America" (the "Covenant"). 48 U.S.C. § 1801. The Covenant became law in 1976 and became completely effective in 1986. The Covenant defines the CNMI's legal and political relationship with the United States. Covenant §§ 101-105; *United States ex rel. Richards v. De Leon Guerrero*, 4 F.3d 749, 754 (9th Cir. 1993). The Covenant gives the people of the CNMI the right to local self-government, and enables the U.S. federal government to enact legislation applicable to the CNMI as long as the legislation can be made applicable to the states or if the legislation expressly names the CNMI. Covenant §§ 103, 105.

**[2]** Section 501 of the Covenant lists specific provisions of the U.S. Constitution that apply to the CNMI.[2] Zheng argues

---

[2]Section 501 provides in its entirety:

(a)  To the extent that they are not applicable of their own force, the following provisions of the Constitution of the United States will be applicable within the Northern Mariana Islands as if the Northern Mariana Islands were one of the several States: Article I, section 9, Clauses 2, 3, and 8; Article I, Section 10, Clauses 1 and 3; Article IV, Section 1 and Section 2, Clauses 1 and 2; Amendments 1 through 9, inclusive; Amendment 13; Amendment 14, Section 1; Amendment 15; Amendment 19; and Amendment 26; provided, however, that neither trial by jury nor indictment by grand jury shall be required in any civil action or criminal prosecution based on local law, except where required by local law. Other provisions of or amendments to the Constitution of the United States, which do not apply of their own force within the Northern Mariana Islands, will be applicable within

§ 501 is an exclusive list of the provisions of the U.S. Constitution that apply to the CNMI. Because neither the commerce clause nor the territorial clause are included in § 501, Zheng contends they do not apply to the CNMI.

Zheng relies upon *Fleming v. Dept. of Public Safety*, to support her argument. 837 F.2d 401, 405 (9th Cir. 1988) (overruled on other grounds by *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989)). In *Fleming*, we held that the Eleventh Amendment does not apply to the CNMI because the Eleventh Amendment was not included in the list of constitutional provisions set forth in § 501. *Id.* at 405.

In *Fleming*, Lawrence Fleming sued the CNMI Department of Public Safety, alleging that the department deprived him of his due process and equal protection rights, in violation of 42 U.S.C. § 1983, by the way it handled his application to become a police officer. *Id.* at 403. The department argued it was immune from suit because Eleventh Amendment sovereign immunity applied to the CNMI. *Id.* at 405. We disagreed and concluded the CNMI does not enjoy Eleventh Amendment immunity because the Eleventh Amendment is "conspicuously absent" from § 501 of the Covenant. *Id.* We reasoned,

> From the specificity with which the applicable provisions of the United States Constitution are identified, it is clear that the drafters considered fully each constitutional amendment and article for inclusion in the

---

the Northern Mariana Islands only with approval of the Government of the Northern Mariana Islands and of the Government of the United States.

(b) The applicability of certain provisions of the Constitution of the United States to the Northern Mariana Islands will be without prejudice to the validity of and the power of the Congress of the United States to consent to Sections 203, 506 and 805 and the proviso in Subsection (a) of this Section.

Covenant. That they deliberately declined to include the eleventh amendment unequivocally demonstrates their desire that the Commonwealth not be afforded eleventh amendment immunity. *Id.*

In the present case, Zheng argues that the commerce clause and territorial clause are like the Eleventh Amendment. Because they are not included in § 501, Zheng contends they do not apply to the CNMI. Zheng then reasons the U.S. government lacked jurisdiction to prosecute her for sex trafficking and her other offenses because the criminal statutes she was convicted of violating were enacted pursuant to Congress's power under the commerce clause or territorial clause.

We disagree with Zheng's reasoning. The issue of whether the commerce clause or territorial clause apply to the CNMI is misleading. Section 501 sets forth constitutional provisions that are "applicable within the Northern Mariana Islands as if the Northern Mariana Islands were one of the several States . . . ." Unlike the Eleventh Amendment, the commerce clause and the territorial clause generally are not constitutional provisions that apply to the states.[3] These are constitutional provisions that apply to the United States Congress. Whether the commerce clause and territorial clause "apply to" the CNMI does not affect the authority of Congress to enact legislation applicable to the CNMI.

[3] Section 501 does not include a single constitutional provision that involves Congressional authority to legislate. If we adopted Zheng's interpretation of *Fleming*, Congress would have no authority to enact legislation applicable to the CNMI whatsoever. Such a result is nonsensical and conflicts with § 105 of the Covenant, which expressly provides, "The United States may enact legislation in accordance with its

---

[3]We acknowledge the dormant commerce clause does apply to the states. We make no conclusion regarding whether the dormant commerce clause applies to the CNMI. That issue is not before us.

constitutional processes which will be applicable to the North-
ern Mariana Islands . . . ." *See Cook Inlet Native Ass'n v.
Bowen,* 810 F.2d 1471, 1474 (9th Cir. 1987) (stating sections
of a statute should not be interpreted to render another part
inoperative or to defy common sense). Section 105 assumes
there are constitutional processes that would enable Congress
to legislate for the CNMI.[4] We agree.

[4] Accordingly, we hold Congress has the authority to
enact legislation applicable to the CNMI. This authority is not
limited by the exclusion or omission of constitutional provi-
sions in § 501 of the Covenant.

[5] While the commerce clause provides a constitutional
basis for Congress's legislative authority in the Common-
wealth, the Covenant does limit Congress's legislative power.
*De Leon Guerrero,* 4 F.3d at 754. Pursuant to § 501(a) of the
Covenant, 18 U.S.C. §§ 2421 and 2314 are applicable to the
CNMI because they were enacted before the Covenant's 1978
effective date, and are applicable to the several states and
Guam. *See United States v. Taitano,* 442 F.2d 467, 468-69
(9th Cir. 1971) (affirming transportation for prostitution con-
viction involving transportation of victims to Guam).

[6] By contrast, 18 U.S.C. § 1591(a) was enacted after the

---

[4]Section 105 provides in its entirety:

The United States may enact legislation in accordance with its
constitutional processes which will be applicable to the Northern
Mariana Islands, but if such legislation cannot also be made
applicable to the several States the Northern Mariana Islands
must be specifically named therein for it to become effective in
the Northern Mariana Islands. In order to respect the right of self-
government guaranteed by this Covenant the United States agrees
to limit the exercise of that authority so that the fundamental pro-
visions of this Covenant, namely Articles I, II and III and Sec-
tions 501 and 805, may be modified only with the consent of the
Government of the United States and the Government of the
Northern Mariana Islands.

Covenant's effective date. For legislation enacted after the Covenant's effective date, we balance the federal interests served by the legislation against the degree of intrusion into local affairs. *See De Leon Guerrero*, 4 F.3d at 755. In this case, the balance tips in favor of applicability because the federal government's significant interest in combating international sex trafficking through United States territories outweighs the intrusion into the CNMI's local affairs.

**[7]** Congress may criminalize conspiracy, sex trafficking, foreign transportation for prostitution, and transportation of persons in execution of fraud in the CNMI as it does in the states. Thus, we conclude the federal government had authority to prosecute Zheng for committing the above crimes.

## B. Sufficiency of the Evidence

Zheng also contends there was insufficient evidence to support her conviction for transportation of persons in execution of fraud and her convictions for sex trafficking.

When a defendant moves for a judgment of acquittal at the close of the government's case, as Zheng did, we review de novo the question of whether sufficient evidence exists to support a guilty verdict. *United States v. Stewart,* 420 F.3d 1007, 1014 (9th Cir. 2005). To determine whether sufficient evidence exists, we view the evidence in the light most favorable to the prosecution and ask whether any rational trial of fact could have found the defendant guilty of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Shipsey*, 363 F.3d 962, 971 n.8 (9th Cir. 2004).

### 1. Transportation of Persons in Execution of Fraud / Travel Fraud

Zheng contends there was insufficient evidence to support her conviction for transportation of persons in execution of

fraud, a violation of 18 U.S.C. § 2314. She argues the money claimed to have been obtained by fraudulent means did not move in interstate or foreign commerce. Zheng claims the record shows Chi and Lian borrowed money in China to pay part of their $6,000 "processing fees" and paid the money to the recruiting firm in China. Because the money allegedly stayed in China, Zheng contends the elements of travel fraud cannot be met. Further, Zheng contends Chi and Lian paid less than $5,000.00 prior to leaving China, which is the minimum amount required to constitute a violation of the travel fraud statute.

[8] Zheng's argument is without merit. Viewing the evidence in the light most favorable to the prosecution, a rational jury could have found Zheng violated 18 U.S.C. § 2314. The evidence supported a finding that Zheng used false promises to induce Chi and Lian to travel from China to the CNMI with the intent to defraud Chi and Lian of $6,000. The evidence further supported a finding that the money came from China and ultimately reached Zheng in the CNMI. Thus, we conclude there was sufficient evidence to support Zheng's conviction for transportation of persons in execution of fraud.

2. *Sex Trafficking*

Zheng also contends there was insufficient evidence to support her two convictions for sex trafficking pursuant to 18 U.S.C. § 1591. She argues the government failed to show she had the requisite knowledge and intent.

[9] Viewed in the light most favorable to the prosecution, there was sufficient circumstantial evidence to support a rational jury finding that Zheng knew force, fraud, or coercion would be used to cause Chi and Lian to engage in prostitution. The government produced evidence that showed Zheng designed a scheme to induce Chinese women to pay $6,000 to move to the CNMI where the women were then required to become prostitutes. Chi and Lian testified they did not

know they would have to be prostitutes in Saipan. The written materials used to recruit Lian and Chi stated sexual activities were prohibited, which supports a finding that Zheng intended to deceive Chi and Lian. Viewing this evidence in the light most favorable to the prosecution, we conclude there was sufficient evidence to support the jury's determination that Zheng was guilty of sex trafficking.

## C.  Evidentiary Rulings

### 1.  Videos of Chi and Lian

Zheng and Liu both contend the district court committed reversible error by denying their requests to admit video evidence of Chi and Lian engaging in prostitution of their own free will.

We review the district court's decision to admit or exclude evidence for an abuse of discretion. *United States v. Plancarte-Alvarez*, 366 F.3d 1058, 1062 (9th Cir. 2004). Such rulings will be reversed only if the error more likely than not affected the verdict. *United States v. Edwards*, 235 F.3d 1173, 1179 (9th Cir. 2000); *United States v. Ramirez*, 176 F.3d 1179, 1182 (9th Cir. 1999).

The videos include lengthy footage of people outside an adult video store, people going in and out of the store, and nothing more. Viewers cannot hear what the people outside the store are saying and cannot see what, if anything, happens inside the store. The footage was filmed after Chi and Lian left the Tea House and after Zheng was indicted.

The district court found the videos were irrelevant and thereby excluded by Federal Rule of Evidence 402. The district court also concluded the videos should be excluded under Federal Rule of Evidence 403 as their admission would result in "unfair prejudice," "confusion of the issues," and would constitute "undue delay and concomitant waste of time."

Additionally, the court concluded the videos were barred by Federal Rule of Evidence 608, which prohibits extrinsic evidence offered to prove specific conduct of a witness.

**[10]** We conclude the district court did not abuse its discretion by excluding the videos. The videos are long and devoid of admissible evidence. Chi and Lian admitted they engaged in prostitution to support themselves after Zheng's arrest and the closing of the Tea House. The defendants were not entitled to present extrinsic evidence of specific acts that Lian and Chi admitted they committed. We conclude the district judge properly relied upon Federal Rules of Evidence 402, 403, and 608.

### 2.   *Special Agent James Barry's Testimony*

Liu contends the district court committed reversible error by allowing Special Agent James Barry to testify regarding out of court statements made by Lian and Chi. The statements were admitted pursuant to Federal Rule of Evidence 801(d)(1)(B). This rule of evidence provides that a statement is not hearsay if the statement is a prior consistent statement by a witness and it is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive. Fed. R. Evid. 801(d)(1)(B).

In order to admit statements under Rule 801(d)(1)(B), the party that seeks to admit the statements must satisfy four elements: "(1) the declarant must testify at trial and be subject to cross-examination; (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony; (3) the proponent must offer a prior consistent statement that is consistent with the declarant's challenged in-court testimony; and, (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose." *United States v. Collicott*, 92 F.3d 973, 979 (9th Cir. 1996); *see also Tome v. United States*, 513 U.S. 150, 157-58 (1995).

In this case, the declarants, Chi and Lian, both testified at trial and were subject to cross examination. Liu challenged the credibility of Lian and Chi by presenting evidence that the women had received financial assistance from the FBI. Liu implied Lian and Chi fabricated their testimony in order to receive financial assistance from the FBI. Agent Barry, the proponent, testified about the content of Lian and Chi's statements before the FBI began providing them with financial assistance. Lian and Chi's statements, as presented by Agent Barry, were largely consistent with their in-court testimony. Accordingly, all four elements are satisfied by Agent Barry's testimony.

**[11]** Rather than reversible error, this is a textbook example of when to apply Federal Rule of Evidence 801(d)(1)(B), and we conclude the district court did not abuse its discretion when it permitted Agent Barry to testify about Lian and Chi's prior consistent statements.

## D.  *Prosecutorial Misconduct*

Zheng contends the government engaged in prosecutorial misconduct, which violated her due process rights and necessitates a new trial. We review the district court's rulings on alleged prosecutorial misconduct for an abuse of discretion. *United States v. Murillo*, 288 F.3d 1126, 1140 (9th Cir. 2002). We review de novo allegations of due process violations. *See United States v. Amlani*, 111 F.3d 705, 712 (9th Cir. 1997). Failure to disclose material information to the defense is constitutional error only if the result of the proceeding would have been different had the information been disclosed. *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 434-36 (1995)). *See also Brady v. Maryland*, 373 U.S. 83, 87 (1963).

### 1.  *The Government's Pretrial Investigation of Chi and Lian's Veracity*

First, Zheng contends the government failed to adequately investigate Chi and Lian after learning they voluntarily

engaged in prostitution after leaving the Tea House. Chi and Lian originally told FBI Agent Barry they were no longer working as prostitutes. The government later learned Chi and Lian had engaged in prostitution after leaving the Tea House, and the government informed defense counsel of this fact. Lian and Chi testified at trial that they had engaged in prostitution outside the Tea House, and the defense used their initial lie to undermine their credibility at trial.

On appeal, Zheng contends the government's discovery of Chi and Lian's lie should have triggered additional investigation. Zheng contends that the prosecution's act of proceeding to trial without further investigation violated her due process rights. The district court found the prosecution had exhaustively investigated its case and concluded Zheng was not denied due process.

**[12]** We agree with the district court. The government did not engage in prosecutorial misconduct by proceeding to trial without additional investigation, and Zheng's due process rights were not violated. The government did disclose the fact that Chi and Lian engaged in prostitution after leaving the Tea House, and Zheng was able to use this information to impeach Chi and Lian at trial.

2. *Withholding Impeachment Evidence Regarding the Wangs*

Second, Zheng contends the government withheld impeachment evidence regarding two witnesses, Bin Wang and Lan Juan Wang. The Wangs were business partners of Zheng and Liu. They were involved in the Tea House and probably could have been tried as accomplices.

Zheng claims the prosecution withheld information about attempts to provide immigration benefits to the Wangs and information about immunity or non-prosecution agreements

for the Wangs. Zheng argues this information could have been used as impeachment evidence.

The government denied the accusation that the Wangs had been granted immunity and likewise denied that information had been withheld from the defense. The district court rejected the argument that the prosecution had withheld impeachment evidence from the defense.

The defense only offered the fact that Bin Wang admitted involvement in the Tea House and had not been indicted to support its contention that there was a grant of immunity. Defense counsel's speculation does not demonstrate that the district judge erred.

The government admitted and eventually disclosed to the defense that it did inquire about the Wangs' eligibility for certain immigration benefits, learned they were ineligible for the benefits, and did not inform the Wangs of the inquiry. As the Wangs had no knowledge of the inquiry, the inquiry had no value as impeachment evidence.

[13] We conclude Zheng is not entitled to a new trial based on her allegations that the government withheld impeachment evidence regarding the Wangs. The district court did not clearly err by accepting as true the government's assertion that the Wangs were not granted immunity. Also, an inquiry regarding immigration benefits made by the government unbeknownst to the Wangs is not impeachment evidence.

3.   *Chi's Testimony that she was Relocated to Guam for her Safety*

Third, Zheng contends the prosecution breached its duty to correct false testimony by not correcting Chi's testimony, and Zheng further claims her convictions for sex trafficking were secured by false impressions stemming from Chi's testimony, which constitutes a due process violation that requires a new

trial. Chi testified she understood that she was relocated to Guam from the CNMI by the U.S. government for her safety. Agent Barry testified that safety was a benefit of relocating Chi to Guam, but it was not the primary reason for her relocation.

[14] The district court rejected as unfounded "any implication that the prosecution either knowingly presented false material evidence or that it sat by and knowingly allowed false evidence to be presented." We conclude the district court did not abuse its discretion in its determination that the prosecution did not engage in misconduct by allowing Chi to testify regarding her subjective belief.

### E.   Jury Instructions

[15] Zheng contends a new trial is warranted because the district court declined to give two jury instructions requested by Zheng. Generally, a district court's formulation of jury instructions is reviewed for an abuse of discretion.[5] *See United States v. Fernandez*, 388 F.3d 1199, 1246 (9th Cir. *2004); United States v. Shipsey*, 363 F.3d 962, 966 n.3 (9th Cir. 2004). We consider whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation. *United States v. Garcia-Rivera*, 353 F.3d 788, 791-92 (9th Cir. 2003).

Zheng requested a jury instruction that would have informed the jury that neither the commerce clause nor the territorial clause of the U.S. Constitution apply to the CNMI. Zheng contends the district court's failure to give this instruction prevented her from presenting a viable defense theory to the jury.

---

[5]There are exceptions to this general rule. For example, whether a jury instruction misstates elements of an offense or whether instructions adequately present a defendant's theory of the case are questions that are reviewed de novo. *Shipsey*, 363 F.3d at 966 n.3.

We conclude the district court properly denied Zheng's request on the grounds that the applicability of the commerce clause and the applicability of the territorial clause to the CNMI are legal issues beyond the purview of the jury.

Zheng also requested a jury instruction regarding the testimony of co-conspirator, Bin Wang. Wang worked at the Tea House and testified against Zheng and Liu. Zheng requested an instruction cautioning the jury against believing Wang because she suspected Wang had been given immunity by the prosecution in exchange for his testimony. The government denied Wang had been granted immunity.

The district court declined to give the immunity instruction although it did instruct the jury to consider Wang's testimony with greater caution in light of the fact that he could be considered an accomplice. In *United States v. Morgan*, we concluded "there is no significant distinction between a cautionary instruction on the testimony of an accomplice and a cautionary instruction on one granted immunity" because both instructions direct the jury to receive the testimony with caution and weigh it with care. 555 F.2d 238, 243 (9th Cir. 1977).

Because the district court did give a cautionary instruction similar to the one requested by Zheng, we conclude the district court did not abuse its discretion in denying Zheng's request to give an instruction regarding Wang's alleged, but unproven, grant of immunity.

## F.   Cumulative Error

Zheng contends the cumulative effect of evidentiary rulings, prosecutorial misconduct, denied jury instructions, and other trial errors warrants a new trial on all charges. As discussed above, all of Zheng's allegations of error at trial are without merit. Accordingly, we conclude cumulative error does not warrant a new trial.

### G. Sentencing and Restitution

Zheng challenges her sentence on two grounds. Zheng first contends the advisory guideline calculation was erroneous because the "loss calculation" of $36,000 for conspiracy and travel fraud was "premised upon speculation and conjecture and not clear and convincing evidence." Loss calculation is a factual determination of the trial court, and this court reviews a factual determination at sentencing for clear error. *United States v. Tulaner*, 512 F.3d 576, 578 (9th Cir. 2008).

The $36,000 loss calculation in Zheng's case is based upon the $6,000 "processing fee" that Zheng required prospective employees to pay, multiplied by the six women from China who came to Saipan to work for Zheng. Zheng contends, at most, the court can only consider the loss incurred by Chi and Lian because they were the only women who testified against Zheng.

Zheng's contention is not supported by law. "[T]he full scope of the defendant's fraudulent conduct is taken into account when calculating the intended loss." *Id*. In this case, the government presented evidence that four other women were employed by the Tea House as prostitutes and that they were recruited in the same manner as Chi and Lian.

Zheng complains her pre-sentence report (PSR) "does not even identify the other 'victims' upon whom it based its loss calculation." This statement is false. The PSR states the names of other known victims, Wei Qui Xiang, Chao Hai Hua, Wang Mei Li, and Mu Ying.

**[16]** We therefore conclude the district court made no clear error by calculating a loss of $36,000 for Zheng's conspiracy and travel fraud convictions because the district court's loss calculation is supported by evidence that Zheng brought six women from China to Saipan to work as prostitutes and charged each of them $6,000.

Zheng's second challenge to her sentence is that the district court's restitution order is improper. Zheng contends there is not any basis for the restitution calculations of $25,220 for Chi and $22,220 for Lian. The record belies Zheng's argument.

Chi and Lian testified that they signed contracts to work in Saipan for $7.00 per hour. They worked ten months with no time off for evenings or weekends. The probation officer who prepared the PSR estimated they would have earned about $23,220 had they been paid regularly and earned overtime. Additionally, Lian and Chi each paid Zheng $6,000 in "processing fees" to go to the CNMI. Thus, Lian and Chi each estimated a total loss of $29,220. The probation officer then took into account money Lian and Chi received while working at the Tea House and subtracted that amount from the $29,220 total.

A restitution order is reviewed for an abuse of discretion, provided that it is within the bounds of the statutory framework, and factual findings supporting an order of restitution are reviewed for clear error. *United States v. Gordon*, 393 F.3d 1044, 1051 (9th Cir. 2004). The district court's valuation methodology is reviewed de novo. *United States v. Doe*, 374 F.3d 851, 854 (9th Cir. 2004).

**[17]** Here, the district court used a sound valuation methodology. Zheng's contention that there is no basis in fact or methodology for restitution for Chi and Lian is without merit. Accordingly, we affirm the district court's restitution order.

## CONCLUSION

We affirm the district court on all challenged grounds and conclude the federal government had authority to prosecute Zheng; there was sufficient evidence to convict Zheng; the district court's evidentiary rulings against Zheng and Liu do not constitute reversible error; there was no prosecutorial mis-

conduct; the district court properly instructed the jury; and the district court properly sentenced Zheng.

AFFIRMED.