**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CATHERINE LOPENA TORRES, *Petitioner*, | No. 13-70653 |
| v. | Agency No. A087-957-047 |
| WILLIAM P. BARR, Attorney General, *Respondent.* | OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted En Banc May 28, 2020[*]
San Francisco, California

Filed September 24, 2020

Before: Sidney R. Thomas, Chief Judge, and Kim McLane
Wardlaw, Ronald M. Gould, Johnnie B. Rawlinson,
Consuelo M. Callahan, Milan D. Smith, Jr., Sandra S.
Ikuta, Paul J. Watford, Daniel A. Bress, Danielle J.
Hunsaker and Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Wardlaw

---

[*] The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

## SUMMARY[**]

### Immigration

Granting in part and denying in part Catherine Torres's petition for review of a decision of the Board of Immigration Appeals, and remanding, the en banc court overruled *Minto v. Sessions*, 854 F.3d 619 (9th Cir. 2017), and held that Torres, who was present in the Commonwealth of the Northern Mariana Islands (CNMI) when the Immigration and Nationality Act (INA) became applicable there, was not removable under 8 U.S.C. § 1182(a)(7)(a)(i), which applies to noncitizens who do not possess a valid entry document "at the time of application for admission."

Under the 1976 Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, certain CNMI citizens and residents, as well as anyone born on CNMI soil, became United States citizens. However, the CNMI government retained control over immigration into the territory, permitting large numbers of temporary "guest workers" to work there. In 2008, Congress enacted the Consolidated Natural Resources Act (CNRA), which imposed the INA within the CNMI effective November 28, 2009.

Under the INA, a noncitizen present in the United States without being admitted or paroled is inadmissible under 8 U.S.C. § 1182(a)(6)(A)(i). Because the sudden imposition of the INA could have rendered thousands of guest workers

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

and others removable under this provision overnight, Congress provided a two-year reprieve in which any alien "lawfully present in the Commonwealth" on the effective date could not be removed under § 1182(a)(6). However, beginning in 2010, the federal government began charging some CNMI residents as removable under § 1182(a)(7), a provision not covered by the two-year reprieve.

Torres, a native of the Philippines who entered the CNMI lawfully as a guest worker in 1997, was placed in removal proceedings in 2010. She was charged as removable under § 1182(a)(6) and § 1182(a)(7). Torres argued that she fell outside the scope of § 1182(a)(7) on the grounds that she had lawfully entered the CNMI before the INA went into effect and had never submitted an application for admission into the United States. The immigration judge and the BIA rejected this argument, and a three-judge panel of this court agreed, concluding it was bound by *Minto*, which had held that Minto, who was similarly situated to Torres, was inadmissible under § 1182(a)(7). The *Minto* court reasoned that, because he was present in the United States on the CNRA's effective date without having been admitted or paroled, he was deemed to be an "applicant for admission," and therefore should be deemed to have made an application for admission.

Overruling *Minto*, the en banc court held that the phrase "at the time of application for admission" in § 1182(a)(7) refers to the particular point in time when a noncitizen submits an application to physically enter the United States, and therefore, does not apply to noncitizens such as Torres. In so concluding, the en banc court examined the INA's definition of "admission" and this court's understanding of the term "entry." Further, the en banc court explained that, by using the phrase "time of application for admission"

solely in connection with documents required to lawfully cross the United States border, § 1182(a)(7) signals that the time of application for admission is when a noncitizen seeks permission to physically enter United States territory. The en banc court noted that this construction is supported by the statutory context and aligns with the interpretation of the Fifth and Eleventh Circuits.

The en banc court further explained that *Minto*'s interpretation: 1) failed to understand that the phrase "applicant for admission" is a term of art denoting a particular legal status, as the history of its enactment makes clear; 2) entirely disregarded a precedential decision of the BIA that squarely held to the contrary; and 3) rendered superfluous key provisions of the immigration laws.

The en banc court remanded to the BIA to decide whether Torres was removable under § 1182(a)(6), instructing it to address whether she was "lawfully present" in the CNMI under CNMI law, and thus not removable under § 1182(a)(6).

The en banc court also concluded that Torres is ineligible for cancellation of removal due to her failure to establish ten years of continuous presence in the United States, and concluded that it lacked jurisdiction to consider her request to remand the case to the agency to consider her application for "parole-in place."

**COUNSEL**

Stephen Carl Woodruff (argued), Saipan, Northern Mariana Islands; Janet H. King, King Law Offices, Saipan, Northern Mariana Islands; Daniel S. Volchok, Alex Hemmer, and Rebecca M. Lee, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; for Petitioner.

Lisa Damiano, Attorney; William C. Minick, Trial Attorney; Aimee J. Carmichael, Senior Litigation Counsel; John W. Blakeley, Assistant Director; Joseph H. Hunt, Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

Charles Roth, National Immigrant Justice Center, Chicago, Illinois, for Amici Curiae Organizations Assisting Survivors of Domestic Violence.

**OPINION**

WARDLAW, Circuit Judge:

The Immigration and Nationality Act (INA or "the Act") suddenly applied to the Commonwealth of the Northern Mariana Islands (CNMI) on November 28, 2009. By that point, Catherine Lopena Torres had been lawfully living and working in the CNMI for over a decade. Though she had never applied to enter the United States, she abruptly found herself within the westernmost border of our country. Nevertheless, the Board of Immigration Appeals (BIA) ordered her removed on the ground that she did not possess a valid entry document "at the time of [her] application for

admission" into the United States, in violation of 8 U.S.C. § 1182(a)(7)(a)(i)(I) (hereinafter "§ 1182(a)(7)").

A three-judge panel of this court, in a now-withdrawn opinion, *Torres v. Barr*, 925 F.3d 1360 (9th Cir. 2019), denied Torres's petition for review under our court's decision in *Minto v. Sessions*, 854 F.3d 619 (9th Cir. 2017). *Minto* had held that a respondent "present in the CNMI without admission or parole on November 28, 2009" who is placed in removal proceedings is "'deemed' to be 'an applicant for admission'" and removable under § 1182(a)(7) for not possessing a valid entry document at the time of application for admission. *Id.* at 624–25. However, the panel also joined a concurrence by Judge Berzon, which argued that *Minto* was wrongly decided because its atextual interpretation of the INA had rendered superfluous key provisions of our immigration laws. 925 F.3d at 1363–64.

A majority of the non-recused active judges of our court voted to rehear this case en banc to reconsider *Minto*'s construction of § 1182(a)(7).

## I.

### A.

Around 2000 B.C.E., the ancestors of the Chamorros traveled by canoe from Southeast Asia to an archipelago situated roughly equidistant from what we now call Japan, Papua New Guinea, and the Philippines. *About the CNMI*, Office of the Governor of the Commonwealth of the Northern Mariana Islands.[1] Three and a half millennia later, in 1521, Portuguese explorer Ferdinand Magellan landed on

---

[1] https://tinyurl.com/yyf3sa6h (last visited July 23, 2020).

one of these islands, marking the first known encounter between Europeans and the Chamorros.  *Id.*

A little more than a century after that, Queen Maria Ana of Spain, for whom the islands are now named, financed an expedition to establish a colony on the islands.  *Id.*; *Mariana Islands*, Encyclopedia Britannica.[2]    The process of colonization was a brutal one in which many islanders were felled by a deadly combination of violence and foreign disease.    *Northern Mariana Islands*, Encyclopedia Britannica.[3]  For the next three centuries, the Spanish ruled the Marianas.  *See United States ex rel. Richards v. De Leon Guerrero*, 4 F.3d 749, 751 (9th Cir. 1993).  At the conclusion of the Spanish-American War of 1898, however, the Marianas came under German, and then Japanese, rule.  *Id.*

After World War II, the United Nations appointed the United States to administer the island territory through a Trusteeship Agreement, and the relationship between the United States and the Marianas gradually grew more intertwined.  *See generally* Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, 61 Stat. 3301, T.I.A.S. No. 1665.    In 1976, the United States dissolved this Trusteeship Agreement and replaced it with the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America ("the Covenant").  Joint Resolution of March 24, 1976, Pub. L. No. 94-241, 90 Stat. 263.[4]  After the Covenant

---

[2] https://tinyurl.com/y6jwrrzg (last visited July 23, 2020).

[3] https://tinyurl.com/yxgslc6u (last visited August 26, 2020).

[4] The Covenant came into full effect in 1986, at which point President Reagan issued a presidential proclamation terminating the Trusteeship Agreement.  Proclamation No. 5564, 51 Fed. Reg. 40,399

went into effect, certain CNMI citizens and residents, as well as anyone born on CNMI soil, became citizens of the United States. *See id.* art. III; *Sabangan v. Powell*, 375 F.3d 818, 819–21 (9th Cir. 2004).

At the time, there were roughly 16,000 people living in the CNMI. S. Rep. No. 110-324, at 2 (2008). The CNMI government retained nearly exclusive control over immigration to the territory. *See* Covenant § 503(a), 90 Stat. at 268. Although Congress initially envisioned that United States immigration laws would operate within the CNMI within a few years, the CNMI continued to administer its own immigration laws for more than three decades. S. Rep. No. 110-324, at 2–4. During this time, the CNMI government permitted large numbers of temporary "guest workers" to work in the island territory, primarily in the garment sector and other private industries. S. Rep. No. 110-324, at 2–4; *see also* S. Rep. No. 107-28, at 6–7 (2001). These guest workers lacked any U.S. immigration status. S. Rep. No. 110-324, at 4; S. Rep. No. 107-28, at 6–7. As the population of the CNMI expanded to 80,000 people, Congress grew increasingly concerned by what it saw as the "ineffective border control[s]" of the territory. S. Rep. No. 110-324, at 2–3.

As a result, Congress enacted the Consolidated Natural Resources Act of 2008 (CNRA), Pub. L. No. 110-229, 122 Stat. 754 (codified in relevant part at 48 U.S.C. §§ 1806–1808), which imposed United States immigration laws, in particular the INA, within the CNMI effective November 28,

---

(Nov. 3, 1986); *see also* S.C. Res. 683, U.N. SCOR, 45th Sess., 2972d mtg., at 29, U.N. Doc. S/RES/683 (Dec. 22, 1990) (recognizing the termination of the Trusteeship Agreement).

2009, 8 C.F.R. § 1001.1(bb).[5] Under the INA, a noncitizen present in the United States without being formally admitted or temporarily paroled into the country is inadmissible.[6] 8 U.S.C. § 1182(a)(6)(A)(i) (hereinafter "§ 1182(a)(6)"). Thus, the sudden imposition of the INA could have rendered thousands of guest workers and other lawful residents under CNMI law removable overnight. In an effort to ensure that these guest workers and others like them were not unfairly penalized, and that the CNMI economy would not be destabilized by the deportation of previously admitted guest workers, Congress provided a two-year reprieve in which any alien "lawfully present in the Commonwealth" on November 28, 2009 could not be removed for being present in the United States without admission or parole in violation of § 1182(a)(6). 48 U.S.C. § 1806(e)(1)(A).

## B.

Starting in 2010, just months after the INA went into effect in the CNMI, the federal government began charging some CNMI residents as removable under 8 U.S.C. § 1182(a)(7), a provision of the INA not covered by the CNRA's two-year reprieve, for failing to possess a valid entry document "at the time of application for admission." Many CNMI residents, like Torres, challenged their removal on the basis that, because they had not yet submitted an

---

[5] Although the initial transition date was June 1, 2009, 48 U.S.C. § 1806(a)(1), the Secretary of Homeland Security subsequently exercised discretion under the CNRA, 48 U.S.C. § 1806(a)(3)(A), to delay the effective date until November 28, 2009, *see CNMI Transitional Worker Classification*, 76 Fed. Reg. 55,502, 55,501–03 (Sept. 7, 2011).

[6] This opinion uses the term "noncitizen" as equivalent to the statutory term "alien" in 8 U.S.C. § 1101(a)(3). *See Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020).

application for admission into the United States, they were not removable under this provision. *See, e.g.*, *Minto*, 854 F.3d at 621; *Erwin v. Whitaker*, 752 F. App'x 535, 536 (9th Cir. 2019); *Liqiang Gu v. Barr*, 771 F. App'x 780, 780 (9th Cir. 2019).

*Minto* was our first decision to address the merits of this argument. *Minto* started by noting that a separate provision of the INA, 8 U.S.C. § 1225(a)(1), deems any noncitizen present without admission in the United States an "applicant for admission."[7] 854 F.3d at 624. Conflating the phrase "*applicant* for admission" with "*application* for admission," *Minto* held that any applicant for admission should be treated as having made a continuing application for admission that does not terminate "until it [is] considered by the [Immigration Judge (IJ)]." *Id.* The decision in *Minto* had significant consequences for individuals who were lawfully present in the CNMI before the INA went into effect. Many CNMI residents, like the petitioner in *Minto*, would have had no reason to apply for entry papers into the United States, as they had entered before such papers were required. Yet, under *Minto*, all were removable for lack of documentation under § 1182(a)(7) despite Congress's expressed intent that they be permitted to remain for at least two years after the INA went into effect. 48 U.S.C. § 1806(e)(1)(A).

## C.

Like the petitioner in *Minto*, Torres is a CNMI resident whom the government placed into removal proceedings in

---

[7] The petitioner in *Minto* was a native of Bangladesh who had entered the CNMI on a nonresident worker permit in 1997. *Minto*, 854 F.3d at 622. This worker permit was subsequently revoked, and the petitioner was charged as removable under both § 1182(a)(6) and § 1182(a)(7). *Id.*

2010. Torres, a native of the Philippines, entered the CNMI lawfully as a guest worker in 1997. By November 28, 2009, Torres had given birth to three children in the CNMI, all of whom are U.S. citizens. *See Sabangan*, 375 F.3d at 819–20 (holding that children born in the CNMI after 1978 are citizens of the United States). Torres also filed a federal employment discrimination complaint with the Equal Employment Opportunity Commission (EEOC) and was subsequently fired in retaliation for engaging in protected activity. Torres was contesting her dismissal as the INA became effective in the CNMI.

Nine months later, the Department of Homeland Security served Torres with a Notice to Appear, charging her with being removable under 8 U.S.C. § 1182(a)(6) as a noncitizen "present in the United States without being admitted or paroled," and under 8 U.S.C. § 1182(a)(7), as a noncitizen who "at the time of application for admission" lacked "a valid entry document." Torres contested her removability under § 1182(a)(7) before the IJ, arguing that because she had lawfully entered the CNMI in 1997 before the INA went into effect, and because she had never submitted an application for admission into the United States, she fell outside the scope of that provision.[8] Rejecting this argument, the IJ ordered Torres removed under § 1182(a)(7). The BIA affirmed.

A three-judge panel of our court agreed, denying Torres's petition for review because it was bound by *Minto*'s construction of § 1182(a)(7). Judge Berzon authored a concurrence in which the other two members of the panel joined, arguing that *Minto* was wrongly decided and should

---

[8] Torres also contested her removability under § 1182(a)(6), but the IJ did not reach this ground.

be overruled.  Having considered the question en banc, we now overrule our decision in *Minto.*

## II.

We have jurisdiction under 8 U.S.C. § 1252(a).  "[W]e review de novo both purely legal questions and mixed questions of law and fact."  *Xochihua-Jaimes v. Barr*, 962 F.3d 1175, 1183 (9th Cir. 2020) (quoting *Cordoba v. Holder*, 726 F.3d 1106, 1113 (9th Cir. 2013)).  Only the "BIA's findings of fact [are reviewed] for substantial evidence."  *Padilla-Martinez v. Holder*, 770 F.3d 825, 830 (9th Cir. 2014).

## III.

The complex provisions of the INA have provoked comparisons to a "morass," *Lacsina Pangilinan v. Holder*, 568 F.3d 708, 709 (9th Cir. 2009) (quoting *Agyeman v. I.N.S.*, 296 F.3d 871, 877 (9th Cir. 2002)), a "Gordian knot," *Aguilar v. U.S. Immig. & Customs Enf't*, 510 F.3d 1, 6 (1st Cir. 2007), and "King Minos's labyrinth in ancient Crete," *Lok v. I.N.S.*, 548 F.2d 37, 38 (2d Cir. 1977).  We read this dense statute against the backdrop of our constitutional principles, *see Zadvydas v. Davis*, 533 U.S. 678, 690–99 (2001), administrative law, *see I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16 (2002) (per curiam), and international treaty obligations, *see I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 418, 427 (1999); *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 436–441, 439 n.22 (1987).  Divining its meaning is ordinarily not for the faint of heart.

Fortunately, the task here is relatively straightforward.  Torres was charged as removable under § 1182(a)(7), which renders inadmissible:

any immigrant at the time of application for admission—

(I) who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title, or

(II) whose visa has been issued without compliance with the provisions of section 1153 of this title . . . .

(emphasis added). We must construe the meaning of the phrase "at the time of application for admission." We conclude that the phrase refers to the particular point in time when a noncitizen submits an application to physically enter into the United States.

## A.

We start with the plain meaning of the statute. *See Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1568 (2017) ("We begin, as always, with the text."). Turning first to the definitions provided by the INA, the term "application for admission" refers to "application for admission into the United States" as opposed to "the application for issuance of an immigrant or nonimmigrant visa." 8 U.S.C. § 1101(a)(4). And while the Act does not define the word "application," it defines "admission" to mean "the lawful entry of the alien

into the United States after inspection and authorization by an immigration officer."**[9]** *Id.* § 1101(a)(13)(A). Finally, although the INA does not currently define the term "entry," we have long understood this term to refer to "coming from outside" into the United States. *United States ex rel. Claussen v. Day*, 279 U.S. 398, 401 (1929); *see also United States v. Yong Jun Li*, 643 F.3d 1183, 1186–88 (9th Cir. 2011) (explaining that we continue to construe the INA to incorporate *Claussen*'s conception of "entry"). Taking these definitions together, the phrase "application for admission" means an "application to lawfully come from outside into the United States after inspection and authorization by an immigration officer." Still, this only gets us so far. These definitions alone do not address the core question in this case: at what moment does "the time of application for admission" occur?

By using this phrase solely in connection with documents required to lawfully cross the United States border, § 1182(a)(7) signals that the time of application for admission is the time when a noncitizen seeks permission to physically enter United States territory, regardless of whether the noncitizen is seeking entry from outside the

---

**[9]** "Although we have said that § 1101(a)(13)(A) provides the 'primary, controlling definition' of [admission], we have also 'embrace[d] an alternative construction of the term' when the statutory context so dictates." *Ramirez v. Brown*, 852 F.3d 954, 961 (9th Cir. 2017) (quoting *Negrete-Ramirez v. Holder*, 741 F.3d 1047, 1052 (9th Cir. 2014)); *see also Ocampo-Duran v. Ashcroft*, 254 F.3d 1133, 1134–35 (9th Cir. 2001) (concluding that a post-entry adjustment of status constitutes an "admission" for purposes of removal under 8 U.S.C. § 1227(a)(2)(A)(iii)). As this opinion explains, statutory context confirms that the "port-of-entry" definition in § 1101(a)(13)(A), *id.*, applies in § 1182(a)(7).

country or inside the country at a port of entry.**[10]**  Subsection 1182(a)(7)(A)(i)(I) begins with a list of the types of valid entry documents an immigrant might need to physically come into the country, including a "valid unexpired immigrant visa, reentry permit, [or] border crossing identification card."  Notably, the Act expressly defines a "border crossing identification card" as being for the "purpose of crossing over the borders between the United States and foreign contiguous territory."    8 U.S.C. § 1101(a)(6).  Subsection 1182(a)(7)(A)(i)(I) follows this list of entry documents with the catch-all phrase "or other valid entry document"—a phrase which expressly tethers the statute to the moment of entering into the United States from another country.   The next clause speaks of "a valid unexpired passport, or other suitable travel document," both of which are documents authorizing travel between a foreign state and the United States.  *See* 8 U.S.C. § 1101(a)(30).

Finally, § 1182(a)(7)(A)(i)(I) concludes by referring to a "document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title."  Section 1181(a) explains:

---

**[10]** *See United States v. Aldana*, 878 F.3d 877, 881–82 (9th Cir. 2017) (discussing the meaning of "a place designated by immigration officers" and "port of entry" and noting in dicta that some are within the United States); *see also Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) ("When an alien arrives at a port of entry—for example, an international airport—the alien is on U. S. soil, but the alien is not considered to have entered the country for the purposes of this rule. On the contrary, aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'").

> [N]o immigrant shall be admitted into the United States unless *at the time of application for admission* he (1) has a valid unexpired immigrant visa or was born subsequent to the issuance of such visa of the accompanying parent, and (2) presents a valid unexpired passport or other suitable travel document, or document of identity and nationality, if such document is required under the regulations issued by the Attorney General.

(emphasis added). By using the phrase "at the time of application for admission" in connection with a "valid unexpired immigrant visa" and "a valid unexpired passport or other suitable travel document"—again, documents necessary to cross into the country—§ 1181(a) reinforces our understanding that this phrase refers to the moment of applying for entry at the border.

Subsection 1182(a)(7)(A)(i)(II) confirms this statutory reading. This subsection renders inadmissible any immigrant who, "at the time of application for admission," has a "visa" that was "issued without compliance with" 8 U.S.C. § 1153, which itself governs the issuance of immigrant visas. Like all the documents listed in § 1182(a)(7)(A)(i)(I), the sole document listed in § 1182(a)(7)(A)(i)(II)—an immigrant visa—is the sort of document needed to cross into United States territory. *See* 8 U.S.C. § 1101(a)(16). Because all of the documents listed in connection with the phrase "at the time of application for admission" in § 1182(a)(7)(a)(i) subsections (I) and (II) are of the type needed to lawfully cross into the United States from another country, the most logical reading of that phrase is that it refers to the moment of applying for entry into the country. *See Esquivel-Quintana*, 137 S. Ct. at 1569 (relying

on the "everyday understanding of the term[s] used in" the INA to construe a provision of that statute (quoting *Lopez v. Gonzales*, 549 U.S. 47, 53 (2006)).

Statutory context supports this construction of § 1182(a)(7) as well. *See Abramski v. United States*, 573 U.S. 169, 179 (2014) (explaining that we "interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose'" (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013))). Section 1182(a)(4)(A), which is in the same inadmissibility provision as § 1182(a)(7), renders inadmissible anyone who is or is likely to become a public charge "at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status." Whereas "adjustment of status" is a way of obtaining lawful status while being physically present in the United States, "application for admission" is a way of applying to actually enter the country lawfully. *See* Richard D. Steel, *Steel on Immigration Law* § 7:1 (2019 ed.) (explaining that "adjustment of status" is "a procedure in which certain aliens physically present in the United States can obtain permanent resident status by adjusting their status without leaving the United States"). By juxtaposing "the time of application for . . . adjustment of status" with "the time of application for admission," § 1182(a)(4)(A) confirms our conclusion that "application for admission" should be read as referring to the moment an immigrant applies to physically enter the country.

Relying on *Minto*, the government suggests that even if "the time of application for admission" begins at the moment when an immigrant applies to enter the country, this moment *continues*, potentially for years or decades, until the immigrant appears before the IJ in removal proceedings. We

have previously explained that the phrase "at the time" imposes a "temporal requirement." *United States v. Hooper*, 229 F.3d 818, 821 (9th Cir. 2000). Given that an immigrant submits an "application for admission" at a distinct point in time, stretching the phrase "at the time of application for admission" to refer to a period of years would push the statutory text beyond its breaking point. *See Kyong Ho Shin v. Holder*, 607 F.3d 1213, 1220 (9th Cir. 2010) (counseling that we must use common sense in construing the INA).

Congress knows how to write a statute to encompass a continuous period as opposed to just a single point in time. For example, in 8 U.S.C. § 1257(a), Congress permitted the Attorney General to adjust the status of an immigrant who met certain conditions "at the time of admission *or subsequently*." (emphasis added). Similarly, Congress has imposed legal liability on employers who had constructive knowledge of their employees' unlawful immigration status "at the time of hiring *or afterward*." 8 U.S.C. § 1324a(a)(6)(C)(i) (emphasis added). As these examples show, Congress understands the phrase "at the time" to refer to a single point in time, and when it wants a statute's reach to endure over a continuous subsequent period, it says so. In contrast to these examples, § 1182(a)(7) applies only when a noncitizen lacks a valid entry document "at the time of application for admission." Accordingly, inadmissibility must be measured at the point in time that an immigrant actually submits an application for entry into the United States.

## B.

Our interpretation of § 1182(a)(7) today aligns with that of the only other circuits to have addressed the question in a published opinion. In *Ortiz-Bouchet v. U.S. Attorney General*, the Eleventh Circuit considered whether two

immigrants physically present in the United States were removable under § 1182(a)(7) for failing to have valid documentation at the time of their application for adjustment of status. 714 F.3d 1353, 1355 (11th Cir. 2013) (per curiam). In concluding that they were not, the Eleventh Circuit held that § 1182(a)(7) was inapplicable to undocumented individuals who "were not outside the United States seeking entry." *Id.* at 1356. The Fifth Circuit later adopted the Eleventh Circuit's reasoning, concluding that § 1182(a)(7) "only applies to applicants for admission and not to immigrants . . . who sought post-entry adjustment of status while already in the United States."[11] *Marques v. Lynch*, 834 F.3d 549, 561 (5th Cir. 2016) (quoting *Ortiz-Bouchet*, 714 F.3d at 1356).

Thus, when *Minto* was decided in 2017, it put our circuit's interpretation of § 1182(a)(7) at odds with two other circuit courts' constructions of the statute. We now join the Fifth and Eleventh Circuits in concluding that the statute's reference to "the time of application for admission" refers only to the moment in time when the immigrant actually applies for admission into the United States.

---

[11] Although the Fourth Circuit has not expressly considered the scope of § 1182(a)(7), its unpublished decision in *Pascual v. Carroll* supports our interpretation of this provision. 976 F.2d 726 (4th Cir. 1992) (table) (analyzing § 1182(a)(7) with reference only to the moment the petitioner actually sought entry into the United States). By contrast, an unpublished decision by the Third Circuit adopted an interpretation of § 1182(a)(7) in line with that of *Minto*. *See Alvarenga de Rodriguez v. Att'y Gen.*, 784 F. App'x 852, 853 (3d Cir. 2019). For the reasons discussed in this opinion, we find the reasoning in *Alvarenga de Rodriguez* unpersuasive.

## C.

*Minto* arrived at a different reading of § 1182(a)(7) by relying on 8 U.S.C. § 1225(a)(1), which provides that "[a]n alien present in the United States who has not been admitted . . . shall be deemed for purposes of this chapter an applicant for admission." *Minto* conflated the term "applicant for admission" from § 1225(a)(1) with the term "application for admission" in § 1182(a)(7) and made two leaps of logic from there: first holding that, because Minto was present in the United States on the CNRA's effective date without having been admitted or paroled, he was deemed to be an "applicant for admission," and, second, that he should therefore be deemed to have made an actual *application* for admission under § 1182(a)(7). 854 F.3d at 623–24. This reading failed to understand that the phrase "applicant for admission" is a term of art denoting a particular legal status, as the history of its enactment makes clear. Moreover, *Minto* entirely disregarded a precedential decision of the BIA that squarely held to the contrary.

### 1. History

Section 1225(a)(1) was added to the INA as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, § 302, 110 Stat. 3009-546. "Prior to the passage of IIRIRA, immigration law provided for two types of removal proceedings: deportation hearings and exclusion hearings." *Hose v. I.N.S.*, 180 F.3d 992, 994 (9th Cir. 1999) (en banc). "A deportation hearing was the 'usual means of proceeding against an alien already physically [but not lawfully] in the United States,' while an exclusion hearing was the 'usual means of proceeding against an alien *outside the United States seeking admission*.'" *Id.* (emphasis added) (quoting *Landon v. Plasencia*, 459 U.S. 21, 25 (1982)). Whether an applicant

was eligible for "admission" was determined only in exclusion proceedings, and exclusion proceedings were limited to "entering" noncitizens—those noncitizens "coming . . . into the United States, from a foreign port or place or from an outlying possession," *Plasencia*, 459 U.S. at 24 n.3 (quoting 8 U.S.C. § 1101(a)(13) (1994)). The distinction between those who had entered the United States and those who had not was important: "non-citizens who had entered without inspection could take advantage of the greater procedural and substantive rights afforded in deportation proceedings, while non-citizens who presented themselves at a port of entry for inspection were subjected to more summary exclusion proceedings." *Yin Hing Sum v. Holder*, 602 F.3d 1092, 1100 (9th Cir. 2010); *see also Plasencia*, 459 U.S. at 25–26 (listing some of the differences between these proceedings). This created an anomaly whereby immigrants who were attempting to lawfully enter the United States were in a worse position than persons who had crossed the border unlawfully. *See Yin Hing Sum*, 602 F.3d at 1100; *see also* H.R. Rep. No. 104-469, pt. 1, at 225–29 (1996).

IIRIRA did away with this "'entry doctrine' . . . anomaly." *Yin Hing Sum*, 602 F.3d at 1100. For example, IIRIRA amended 8 U.S.C. § 1101 so that it defined "admission" to mean "lawful entry . . . after inspection and authorization." IIRIRA § 301; *see* H.R. Rep. No. 104-469, pt. 1, at 225–26 (explaining reasons for the amendment). It also "replac[ed] deportation and exclusion proceedings with a general 'removal' proceeding." *Yin Hing Sum*, 602 F.3d at 1100.

Finally, and most importantly for our purposes, IIRIRA added § 1225(a)(1). This provision ensures that all immigrants who have not been lawfully admitted, regardless

of their physical presence in the country, are placed on equal footing in removal proceedings under the INA—in the position of an "applicant for admission."   8 U.S.C. § 1225(a)(1); *see* H.R. Rep. 104-469, pt. 1, at 225 (explaining that § 1225(a)(1) "[wa]s intended to replace certain aspects of the current 'entry doctrine,' under which illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry").   Now, in removal proceedings, the relevant distinction for procedural purposes is whether the immigrant has been lawfully admitted, regardless of actual physical presence.  *Compare* 8 U.S.C. § 1229a(c)(2)(A) (explaining that when the respondent in removal proceedings is "an applicant for admission," he has the burden of proof with regards to certain elements of the removal proceeding), *with id.* § 1229a(c)(3)(A) (explaining that when the respondent has been admitted, the burden of proof is on the government).

*Minto* misread this deeming provision, which places some physically-but-not-lawfully present noncitizens into a fictive legal status for purposes of removal proceedings, as altering the meaning of a substantive ground of inadmissibility that refers to the time of a real event: an actual application for admission.   The language of § 1182(a)(7), the inadmissibility provision at issue in this case, first entered our immigration laws in its current form in 1952.  *See* Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 212(a)(20), 66 Stat. 163, 183–84; *see also* Alien Registration Act of 1940, Pub. L. No. 76-670, § 30, 54 Stat. 670, 673.  Congress would have made it plain if the deeming provision, enacted some four decades later, altered

the longstanding meaning of § 1182(a)(7).**[12]** For example, the 1996 IIRIRA explicitly clarified the meaning of one of the terms in the phrase "at the time of application for admission" by adding a new definition of "admission" as "lawful entry." IIRIRA § 301. Congress did not act to define "application" in that same provision, however, so it could not have meant *sub silentio* to equate "applicant" with "application."**[13]**

## 2. BIA Precedent

Although *Minto* failed to acknowledge or distinguish it, the BIA had previously issued a precedential decision, *Matter of Y-N-P-*, 26 I. & N. Dec. 10 (BIA 2012), to which

---

**[12]** To the contrary, the available evidence suggests that Congress specifically understood that § 1182(a)(7) would continue its historical meaning. *See* H.R. Rep. No. 104-828, at 208, 209 (1996) (Conf. Rep.) (observing that § 1182(a)(6) would apply where noncitizens had already "made an entry without inspection," and § 1182(a)(7) would apply where the "*examining* immigration officer determines that an *arriving* alien" lacks valid documents (emphases added)).

**[13]** The government notes that 8 U.S.C. § 1225(b)(1)(A)(i) allows expedited removal of noncitizens who are "arriving in the United States" or certain noncitizens who are physically, but not lawfully, present in the United States if they are "inadmissible under section 1182(a)(6)(C) or 1182(a)(7)." Thus, the government argues, Torres need not have been "physically at the border" to have made an application for admission under § 1182(a)(7). However, no case has held that § 1225(b)(1) allows an immigration officer to apply § 1182(a)(7) to noncitizens who are physically but unlawfully present in the United States. Indeed, § 1182(a)(7), as opposed to § 1182(a)(6)(C), may apply only to noncitizens who are "arriving in the United States." 8 U.S.C. § 1225 (b)(1). But because § 1225(b)(1) references only an immigration officer's authority, and not a court's authority, we need not resolve the full scope of § 1225(b)(1)(A)(iii) in order to conclude that § 1182(a)(7) does not apply to a noncitizen in Torres's situation.

our court has already given deference, that is highly relevant here. *See Garcia-Mendez v. Lynch*, 788 F.3d 1058, 1063–65 (9th Cir. 2015) (deferring to *Y-N-P-*'s interpretation of the scope of § 1182(h)); *see also Arevalo v. U.S. Att'y Gen.*, 872 F.3d 1184, 1197 (11th Cir. 2017) (per curiam) (same). Whereas we are presently concerned with the impact of § 1225(a)(1) on the phrase "at the time of application for admission" in § 1182(a)(7), *Matter of Y-N-P-* was concerned with the impact of § 1225(a)(1) on the analogous phrase "applying . . . for admission" in another subsection of § 1182 ("Inadmissible aliens"): the § 1182(h) waiver. In *Matter of Y-N-P-*, the respondent had unlawfully entered, and thus was physically present in the United States without having ever actually applied for admission. 26 I. & N. Dec. at 10. Nevertheless, the respondent argued that she should be deemed an applicant for admission under § 1225(a)(1) and should therefore be eligible for cancellation of removal as a noncitizen "applying . . . for admission" under § 1182(h). *Id.* at 12–13. A three-judge panel of the BIA rejected this argument, emphasizing that the term "applicant for admission" in the deeming provision of § 1225(a)(1) "merely" determines a respondent's legal status for purposes of removal proceedings, and is otherwise "distinguishable from 'applying . . . for admission to the United States' within the meaning of" § 1182(h). *Id.* at 13 (citing *Poveda v. U.S. Att'y Gen.*, 692 F.3d 1168, 1176 (11th Cir. 2012), which defined the phrase "applying for . . . admission" in § 1182(h) with reference to an immigrant seeking "admission at the border"). Just as the BIA concluded that it is a mistake to read the deeming provision, § 1225(a)(1), as altering the meaning of "applying . . . for admission" in § 1182(h), so too is it a mistake to read that provision as changing the meaning

of "the time of application for admission" under § 1182(a)(7).[14]

---

[14] *Minto* relied on the BIA's decision in *Matter of Valenzuela-Felix*, 26 I. & N. Dec. 53 (BIA 2012), which did not interpret the meaning of "the time of application for admission" in any provision of the INA, let alone the meaning of that phrase under § 1182(a)(7). Rather, *Valenzuela-Felix* concerns a statutory provision and a statutory phrase not at issue in this case: 8 U.S.C. § 1101(a)(13)(C), which exempts returning lawful permanent residents from being regarded as "seeking an admission into the United States" for immigration purposes unless they have, *inter alia*, committed certain criminal acts. *Id.* at 54. The BIA determined that the decision whether the noncitizen was a returning lawful permanent resident under § 1101(a)(13)(C) or was seeking an admission into the United States could be made in a subsequent removal proceeding because an "application for admission is a continuing one and that admissibility is determined on the basis of the law and facts existing at the time the application is finally considered." *Id.* at 59–60. There was no doubt in *Valenzuela-Felix*, however that the noncitizen had sought permission to physically enter the United States from abroad, and the only question was whether the noncitizen should receive the benefit of § 1101(a)(13)(C). Therefore, *Valenzuela-Felix*, sheds no light on when (if at all) "the time of application for admission" occurs in the circumstances here, where the noncitizen never sought admission into the United States in the first place. Thus, *Valenzuela-Felix* does not affect our interpretation of the provisions at issue here.

Likewise, none of the other BIA decisions cited by the government addresses § 1182(a)(7) or sheds light on the question of when "the time of application for admission" actually occurs. *See Matter of Kazemi*, 19 I. & N. Dec. 49, 51 (BIA 1984) (explaining that facts that transpired after an application for admission can be considered in determining the respondent's inadmissibility); *Matter of Alarcon*, 20 I. & N. Dec. 557, 562 (BIA 1992) (same); *see also Matter of Accardi*, 14 I. & N. Dec. 367, 369 (BIA 1973) (explaining that a respondent physically present inside the country can be deemed an applicant for admission, which is consistent with today's version of § 1225(a)(1)).

## D.

While our analysis of the text and context of the statute is sufficient to reach our conclusion today, we also note that a contrary reading would render other provisions of the immigration code superfluous. *Minto* worked a double-superfluity to render meaningless Congress's attempt to stave off the sudden destabilizing effect an overnight change of immigration laws would have on workers and residents lawfully present under CNMI law. First, *Minto*'s interpretation of § 1182(a)(7) renders § 1182(a)(6) wholly redundant as a ground of inadmissibility. Anyone present in the United States without admission or parole in violation of § 1182(a)(6) will necessarily lack a valid admission document. Under *Minto*'s reading, therefore, anyone present without a valid admission document is also in violation of § 1182(a)(7), at all times. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34–35 (2003); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174–79 (2012) (regarding the rule against surplusage).

Second, as a result of the superfluity discussed above, *Minto* also renders a complete nullity Congress's two-year reprieve for immigrants lawfully present in the CNMI. Every individual lawfully present in the CNMI as described in the CNRA, 48 U.S.C. § 1806(e)(1)(A), who would otherwise have been removable as an individual present without admission or parole within the meaning of § 1182(a)(6), would necessarily also lack a "valid entry document" within the meaning of § 1182(a)(7). *Minto*'s interpretation would thus allow removal of the very persons Congress sought to protect from removal by enacting the two-year reprieve statute. When a statute permits of two interpretations, we generally adopt the interpretation that

avoids depriving another statute of practical effect. *TRW Inc. v. Andrews*, 534 U.S. 19, 29 (2001); *see also United States v. Castleman*, 572 U.S. 157, 178 (2014) (Scalia, J., concurring in part and concurring in the judgment) (explaining that the "presumption against ineffectiveness" means "that Congress presumably does not enact useless laws").

The government does not contest that *Minto* vitiates Congress's two-year reprieve for CNMI residents. Instead, the government claims we need not worry because it will not abuse the INA by removing the CNMI residents that Congress sought to protect. Yet Congress did not leave the residents of the CNMI "at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010). Instead, it codified a guarantee, which we decline to make meaningless.

In addition, amici[15] correctly emphasize that *Minto* renders inoperative a third statutory provision: Congress's attempt to protect victims of domestic violence through the Violence Against Women Act (VAWA). VAWA protects certain "battered women and children" who are "present in the United States without admission or parole" from removal under § 1182(a)(6)(A)(i). 8 U.S.C § 1182(a)(6)(A)(ii). The government's own data show that nearly 14,000 women and children filed VAWA petitions in 2019. *Number of Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, Violence Against Women Act (VAWA) Self-*

---

[15] Amici are organizations assisting survivors of domestic violence, including the Asian Pacific Institute on Gender-Based Violence, ASISTA Immigration Assistance, the National Coalition Against Domestic Violence, the National Immigrant Justice Center, and the Tahirih Justice Center.

*Petitioner, Fiscal Years 2010–2019, By Case Status, Fiscal Year, and Quarter*, U.S. Citizenship and Immigration Services.**[16]**   The protections Congress sought to provide many of these women would be worthless if the government could make an end-run around VAWA by removing these petitioners for lacking valid documentation while present in the United States, but before they had in fact applied for admission to enter it.

## IV.

Therefore, we grant Torres's petition for review to the extent the BIA determined that she was removable "as an intending immigrant without a . . . valid entry document" under § 1182(a)(7).

The BIA properly concluded that Torres is ineligible for relief in the form of cancellation of removal.  Substantial evidence supports the BIA's determination that Torres failed to carry her burden of establishing ten years of continuous presence in the United States.  Construing § 705 of the CNRA, we held in *Eche v. Holder* that "residence in the CNMI before United States immigration law became effective" does not "count toward the residence required for naturalization as a United States citizen."  694 F.3d 1026, 1030 (9th Cir. 2012).  Torres does not dispute that she resided in the CNMI from 1997 through 2010, a period of time that counts predominantly as residence in the CNMI, but as only a few months in the United States under § 705(c).

Moreover, the BIA correctly noted that although Torres applied for parole-in-place, she presented no evidence that such status had been granted.  Torres asks us to remand her

---

**[16]** https://tinyurl.com/y4lca8ru (last visited July 22, 2020).

case to the agency to determine whether United States Citizenship and Immigration Services should grant her application for parole-in-place under 8 U.S.C. § 1182(d)(5)(A), which grants the Attorney General discretion to "parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." Neither we nor the agency has jurisdiction over this question. *See id.*; 8 C.F.R. § 212.5(a); *Rodriguez v. Robbins*, 715 F.3d 1127, 1144 (9th Cir. 2013) ("The parole process is purely discretionary and its results are unreviewable by IJs."). As the BIA correctly stated, the "parole authority under section 212(d)(5)(A) of the [INA] is delegated solely to the Secretary of Homeland Security and is not within the jurisdiction of the [agency]."

## V.

We therefore grant in part and deny in part the petition for review, and remand to the agency for a determination in the first instance whether Torres was removable under the second ground originally charged in the Notice to Appear— removability as "[a]n alien present in the United States without being admitted or paroled" under § 1182(a)(6). The Notice to Appear issued on July 22, 2010, within the two-year period during which Congress provided that "no alien who is lawfully present in the Commonwealth pursuant to the immigrant laws of the Commonwealth [on the effective date]" shall be removed for a violation of § 1182(a)(6). The BIA should, on remand, address the question whether Torres was "lawfully present" in the CNMI under CNMI law,[17] and

---

[17] Although the BIA noted that Torres lacked an "umbrella permit," that does not end the inquiry as to lawful presence. While the CNMI

thus not removable under § 1182(a)(6).  *See Orlando Ventura*, 537 U.S. at 16.

**PETITION GRANTED IN PART; DENIED IN PART; REMANDED.**

---

government issued some lawfully present guest workers two-year conditional work permits—colloquially called "umbrella permits"—just before the CNRA went into effect, not all lawfully present guest workers received these permits.  *See* USCIS Advises Foreign Nationals Whose Work Permits Expire Before CNMI-Only Visa Categories Are Available, https://tinyurl.com/y2o5prhc (last visited July 25, 2020); *see also de Guzman v. Napolitano*, No. 11-00021, 2011 WL 8186655, at *1 (D. N. Mar. I. Dec. 30, 2011).